UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                    Plaintiff,

            v.

TONY KIRIK, a/k/a Anatoliy Kirik,

                                    Defendant.
_____

REPORT & RECOMMENDATION

21-CR-6063CJS

**PRELIMINARY STATEMENT**

By Order of Hon. Charles J. Siragusa, United States District Judge, dated April

23, 2021, all pretrial matters in the above-captioned case have been referred to this Court

pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 14).

On April 22, 2021, the grand jury returned an eight-count indictment against Tony

Kirik.  (Docket # 12).  Count One of the Indictment charges Kirik with violating 18 U.S.C. § 371

by conspiring to defraud the United States and the Federal Motor Carrier Safety Administration

("FMCSA"), an agency of the United States Department of Transportation ("USDOT"), and to

commit offenses against the United States, specifically violations of 18 U.S.C. §§ 1001(a) and

1519.  (*Id.*).  Counts Two, Three, Four, and Five of the Indictment charge Kirik with falsifying

documents and records, in violation of 18 U.S.C. §§ 2, 1001(a)(3), and 1519.  (*Id.*).  Count Six

charges Kirik with directing another individual to make false statements to an FMCSA

investigator, in violation of 18 U.S.C. §§ 2 and 1001(a)(2).  (*Id.*).  Count Seven charges Kirik

with falsifying and concealing from the FMCSA material facts, in violation of 18 U.S.C. §§ 2

and 1001(a)(1).  (*Id.*).  The final count of the Indictment charges Kirik with aggravated identity

theft, in violation of 18 U.S.C. §§ 2 and 1028A(a)(1).  (*Id.*).

      Currently pending before the Court is Kirik's motion to suppress tangible

evidence seized during the execution of a search warrant on September 26, 2018.[1]  (Docket

## 36, 61).  On August 1, 2023, this Court held an evidentiary hearing on Kirik's motion to

suppress evidence.  (Docket ## 55, 57).  For the reasons discussed below, I recommend denial of

Kirik's motion to suppress evidence.

## FACTUAL BACKGROUND

### I.    Warrant for 105 McLaughlin Road, Suite A

      On September 25, 2018, United States Magistrate Judge Jonathan W. Feldman

signed a warrant authorizing the search of a business premises located at 105 McLaughlin Road,

Suite A, Rochester, New York.  (Docket # 63 at 24-30).  Attached to and incorporated into the

warrant were descriptions of the premises to be searched (Attachment A) and the items to be

seized (Attachment B).  (*Id.*).  The warrant also included an addendum outlining the procedure to

be used to search computers and electronic media.  (*Id.*).  Jason Fernandes, a Special Agent

---

[1]  Kirik filed several motions seeking other forms of relief, including an audibility hearing, a bill of particulars, *Brady* material, a conspiracy hearing, disclosure of witnesses, discovery, rulings pursuant to Federal Rules of Evidence 404(b), 608, and 609, identification of informants, *Jencks* material, preservation of rough notes, suppression of identification evidence, suppression of statements, suppression of wiretap evidence, leave to file additional motions, *in camera* review of presentence investigation reports of government witnesses, and suppression of evidence obtained as a result of his arrest.  (Docket # 36).  Each of the above-referenced motions was decided by the undersigned, withdrawn, or resolved by the parties in open court on April 4, 2023.  (Docket ## 36, 43, 44).

      Kirik also sought severance of certain of the counts in the indictment but withdrew the motion without prejudice to renewal before the district court.  (Docket ## 36, 43, 44).  In addition, Kirik sought dismissal of the indictment based upon alleged violations of his speedy trial rights and the applicable statute of limitations.  (Docket # 36).  Kirik withdrew these motions during proceedings before the Court on August 1, 2023.  (Docket ## 56; 57 at 7, 10-11).

employed by the USDOT Office of the Inspector General, submitted an affidavit in support of the application for the warrant. (*Id.* at 8-21).

In his affidavit, Fernandes affirmed that he had been involved in an ongoing investigation of an alleged conspiracy involving motor carrier companies owned or controlled by Kirik and a named relative (hereinafter referred to as "Y.K."). (*Id.* at ¶ 3). Fernandes explained that the mission of the FMCSA is "to reduce crashes, injuries and fatalities involving large trucks and buses," and it has adopted regulations requiring motor carriers to be properly licensed, insured, maintained, and operated. (*Id.* at ¶ 6). Pursuant to those regulations, motor carriers operating in interstate commerce must obtain a USDOT number by completing and submitting to the USDOT a Form MCS-150, Motor Carrier Identification Report. (*Id.* at ¶ 7). These forms, according to Fernandes, assist the USDOT in collecting and monitoring companies' safety records and other information, including audits, compliance reviews, crash investigations, and inspections. (*Id.*).

Many carriers are also required to complete an additional Form OP-1, Application for Motor Property Carrier and Broker Authority, which is used to obtain interstate operating authority from the USDOT. (*Id.* at ¶ 8). This form requires motor carrier applicants to provide information including their business address, insurance information, information regarding their compliance with USDOT safety regulations, and the carrier's relationship and affiliation with any other motor carrier within the previous three years. (*Id.* at ¶ 9). In order to prevent motor carriers from concealing poor safety or compliance records, federal regulations require motor carriers to identify "reincarnated" or affiliated motor carriers that share common ownership, management, control, or familial relationship. (*Id.* at ¶ 10). Additionally, according to Fernandes's affidavit, regulations prohibit two or more motor carriers "from using common

ownership, common management, common control, or common familial relationship to avoid compliance with legal requirements or otherwise mask or conceal non-compliance or a history of non-compliance." (*Id.*).

The USDOT grants motor carriers operating authority by issuing the carrier a unique identifier known as an MC Number. (*Id.* at ¶ 8). This number determines what types and levels of insurance the motor carrier must obtain prior to receiving operating authority from the USDOT. (*Id.*). According to Fernandes, the FMCSA routinely performs compliance reviews of motor carrier operations, including on-site examinations of records reflecting driver hours, maintenance and inspection of vehicles, driver qualifications, accidents, commercial driver license requirements, and other records used to determine whether the company meets safety and fitness standards. (*Id.* at ¶ 11). After completion of a compliance review, the FMCSA issues the company a safety rating of Satisfactory, Conditional, Unsatisfactory, or Unrated. (*Id.* at ¶ 12). These ratings affect the company's insurance rates, as well as its ability to compete for business. (*Id.* at ¶ 13).

According to Fernandes, motor carriers are required to keep records documenting equipment safety, driver qualifications, driver activities, licensing, recordkeeping practices, and maintenance standards. (*Id.* at ¶ 15). Additionally, motor carriers and drivers are required to record each driver's daily activities, including total driving time, in order to ensure compliance with federal regulations limiting the maximum number of hours drivers may work. (*Id.* at ¶ 16). These records are subject to compliance reviews by the FMCSA. (*Id.* at ¶ 17).

In his affidavit, Fernandes represented that the FMCSA conducted a compliance review of a trucking company called Dallas Logistics during the spring of 2016. (*Id.* at ¶ 20). The Form OP-1 for Dallas Logistics listed its president as an individual named J.Z. (*Id.*). The

4

form also indicated that the company's business address was located in Dallas, Texas and that during the previous three years the company had not been affiliated with any other FMCSA-regulated entities.  (*Id.*).

The information reviewed by the FMCSA during the course of the Dallas Logistics compliance review suggested that the company was actually operated out of Rochester, New York, not Dallas, Texas.  (*Id.* at ¶ 21).  In response to an inquiry by the FMCSA, a letter was mailed to the USDOT on Dallas Logistics letterhead that indicated that J.Z. had intended to relocate to Dallas, Texas but the relocation had been delayed due to illnesses of his father and mother.  (*Id.* at ¶ 22).  According to Fernandes, documents and interviews conducted during the investigation revealed that the letter had been sent by an employee who handled accounting, insurance, and claims for several motor carriers, including Main Street Logistics, Orange Transportation Services, and Dallas Logistics.  (*Id.* at ¶¶ 19, 22).  Fernandes represented that these three companies were all owned or controlled by Kirik and Y.K.  (*Id.* at ¶ 19).

On December 27, 2017, agents interviewed J.Z.  (*Id.* at ¶ 24).  During the interview, J.Z. said that he was a former employee of Orange Transportation Services, which was owned by Kirik.  (*Id.*).  According to J.Z., Kirik had suggested creating a trucking company called Dallas Logistics and identifying J.Z. as its owner and president.  (*Id.*).  J.Z. agreed to the arrangement, stating that he believed that Orange Transportation Services otherwise would go out of business and he would lose his job.  (*Id.* at ¶ 25).  According to J.Z., he was president of Dallas Logistics on "paper" only.  (*Id.*).

J.Z. reviewed the April 26, 2016 letter sent to the FMCSA and indicated that it had been sent without his knowledge and that the statements contained in the letter relating to the health of his parents and his plans to relocate to Dallas were false.  (*Id.* at ¶ 26).  During a

subsequent interview of the employee who had signed and sent the letter (hereinafter referred to as "CW"), CW also confirmed to agents that the letter contained false information and had been prepared at Kirik's direction. (*Id.* at ¶¶ 22, 26). According to Fernandes, the false statements contained in the letter were materially false and part of Kirik's effort "to conceal the fact that Dallas Logistics was an affiliate and reincarnation of Orange Transportation Services, which had received a negative safety rating." (*Id.* at ¶ 23). As his affidavit explained, if the affiliation between Dallas Logistics and Orange Transportation had been disclosed to the USDOT, Dallas Logistics would have received a Conditional safety rating at best, instead of an initial rating of Unrated. (*Id.*).

        During her interview on September 6, 2018, CW reported that Kirik controlled both Dallas Logistics and Orange Transportation Services. (*Id.* at ¶ 27). According to CW, although Kirik's wife was listed as the owner of Orange Transportation Services, she was not involved in the company's daily operations. (*Id.*).

        CW reported that Kirik owned or controlled several motor carrier businesses, including Dallas Logistics and Orange Transportation Services, and that Kirik's motor carrier businesses operated out of an office located at 105 McLaughlin Road, Suite A, Rochester, in the name of Main Street Logistics. (*Id.* at ¶ 28). According to CW, although J.Z. had represented to the FMCSA that Dallas Logistics operated from Texas, the business actually was operated from the McLaughlin Road premises. (*Id.* at ¶ 29). CW reported that Kirik had instructed her to set up an office at a warehouse located off of Pixley Road in Rochester, New York, in connection with the FMCSA compliance review in order "to create the false appearance that it was the office of Dallas Logistics." (*Id.*). CW also stated that Kirik had instructed her to meet with the

FMCSA inspector at the Pixley Road location to provide records and documents to the inspector in connection with the compliance review of Dallas Logistics. (*Id.*).

According to Fernandes, the false statements were designed to conceal from the FMCSA that Dallas Logistics and Orange Transportation were affiliated and shared common ownership. (*Id.* at ¶ 30). Fernandes represented that the investigation revealed that, in addition to the concealment of the relationship between Dallas Logistics and Orange Transportation, Kirik, Y.K. and others had engaged "in a pattern of forming reincarnated motor carrier entities, while concealing the interrelatedness of such motor carrier entities from USDOT." (*Id.*). According to Fernandes, several other entities were identified during the course of the investigation as being affiliated with Kirik and Y.K., including Columbus Freight, Inc., Expeditors, Inc., Logic, Inc., Motor Freight, Inc., Trugreen Logistics, Inc., Main Street Logistics, Cargo Transit, Inc., ABS Logistics, Inc., C[o]astal Trans, Inc., Mile Transport, Inc. and Point 2 Point Trucking, Inc. (*Id.* at ¶ 31). According to Fernandes, since at least 2006, Kirik and Y.K. had failed to disclose the affiliations among these entities on the entities' Forms OP-1 filed with the FMCSA. (*Id.*).

Fernandes explained that the misrepresentations to the FMCSA permitted Kirik to operate motor carrier entities that had been found to have engaged in unsafe practices as motor carrier entities that did not have negative safety practice findings. (*Id.* at ¶¶ 32-34). According to Fernandes, the misrepresentations also impeded the FMCSA's ability to administer and enforce its regulations, permitted those motor carrier entities to fraudulently purchase insurance at levels provided to entities with higher safety ratings, and deceived customers concerning the entities' safety ratings. (*Id.*).

7

CW also reported in her interview that, in preparation for FMCSA compliance reviews, the signatures of the drivers were forged using rubber stamps of various employees' signatures that were stored in her desk.  (*Id.* at ¶ 35).  CW explained that when a driver employed by one of Kirik's motor carriers completed a trip, he submitted an envelope containing a driver log, trip sheet, and receipts of incurred expenses, such as gas, tolls, meals, and weights.  (*Id.* at ¶ 36).  According to CW, the driver log often did not accurately reflect the trip's actual route or duration, although the receipts of incurred expenses did.  (*Id.*).  CW stated that Kirik instructed her to remove any trip receipts that were inconsistent with the false information reported on the driver logs in preparation for the FMCSA compliance reviews.  (*Id.* at ¶ 37).

Both CW and J.Z. reported that Kirik controlled and operated all of his business entities from the McLaughlin Road premises and that the records of his various businesses were stored at that premises.  (*Id.* at ¶ 39).  CW also explained that data from the trip records submitted by drivers was inputted into computers located at the premises and that financial information concerning the entities were stored in either paper or electronic form at the McLaughlin Road premises.  (*Id.* at ¶ 40).

In his affidavit, Fernandes affirmed that imaging or seizure of computers and electronic media storage devices during search warrant executions is often necessitated by the technical requirements of conducting the search and the volume of information frequently stored on such devices.  (*Id.* at ¶ 44).  Accordingly, his application for the McLaughlin Road warrant requested permission to image the electronic media storage devices found at the premises or to seize them in order to permit a full review of the materials they stored.  (*Id.*).

The warrant for the McLaughlin Road premises described the premises containing Suite A as a commercial building housing five different suites.  (*Id.* at 25-26, Attachment A).

The warrant authorized a search of Suite A; it did not authorize searches for any of the other four suites.  (*Id.*).  According to the warrant, Suite A was located in the center of the building with a main entrance through a glass door and five bay doors located on the front right side of the suite.  (*Id.*).  The warrant indicated that Suite A also had a metal gray door, a fixed steel ladder leading to the roof, four tinted windows in the front center of the suite, and four windows to the left of the main entrance.  (*Id.*).  The warrant included photographs of the premises.  (*Id.*).

The warrant authorized the seizure of evidence from January 1, 2006 through the date of the warrant concerning conspiracy, false statements, mail fraud, and wire fraud violations.  (*Id.* at 27-29, Attachment B).  Specifically, it authorized the seizure of documents concerning the "ownership, control, business operations and financial activities[,] . . . includ[ing] incorporation records, shareholder certificates and other documentation of ownership, tax records, financial accounting records, vehicle registrations, vehicle maintenance files[,] driver reimbursement records[,] expense receipts, driver logs, trip data, toll records, credit card records, employee information and identifiers, payroll records, load confirmation sheets, delivery tickets, bills of lading, insurance policies and communications with insurance carriers, and driver qualification and licensing records" for the following entities:

      i.      Columbus Freight, Inc.

      ii.     Dallas Logistics, Inc.

      iii.    Eagle Expeditors, Inc.

      iv.    Logic, Inc.

      v.     Motor Freight, Inc.

      vi.    Orange Transportation Services

      vii.   Trugreen Logistics, Inc.

       viii.     Main Street Logistics

       ix.     Cargo Transit, Inc.

       x.      ABS Logistics

       xi.     Coastal Trans, Inc.

       xii.     Mile Transport, Inc.

       xiii.     Point 2 Point Trucking, Inc.

(*Id.*).  In addition, the warrant authorized the seizure of documents referring or relating to the USDOT or the FMCSA, residency documents, including utility bills, bank statements, lease agreements, wire transfers, records of safe deposit boxes or off-site storage locations, and documents indicating ownership or control of the premises, including mail addressed to the premises.  (*Id.*).

       The warrant also authorized the search and seizure of computers, electronic storage devices, electronic devices, and audio and video surveillance systems.  (*Id.*).  An addendum to the warrant authorized the search of computer or electronically-stored information within sixty days using a specific search methodology.  (*Id.* at 30).

## II.    **Execution of the Search Warrant**

       On August 1, 2023, this Court conducted an evidentiary hearing concerning the execution of the search warrant for 105 McLaughlin Road, Suite A, on September 26, 2018.[2]  (Docket # 55).  The government called Fernandes as its sole witness; the defense called no witnesses.  (*Id.*).

---

[2] The transcript of the hearing is referred to herein as "Tr. ___."  (Docket # 57 ).

Fernandes testified that at the time of the search he was a special agent employed by the USDOT Office of Inspector General. (Tr. 17-18, 45). He explained that he was the lead case agent for the investigation, had prepared the affidavit in support of the search warrant, and had prepared and submitted the search warrant return after the warrant was executed. (Tr. 19; Government's Exhibits ("G. Exs.") 1 and 2). Fernandes testified that during the search approximately 205 containers of documents were seized and 26 media devices were imaged. (Tr. 20; G. Ex. 2).

According to Fernandes, as lead case agent, he coordinated the search of the premises, which involved approximately thirty agents. (Tr. 21). Prior to the search, he briefed the search team concerning the investigation and reviewed Attachment B to the search warrant with the search team so that they would know what to seize during the search. (*Id.*). Fernandes also emailed the members of the search team a copy of Attachment B the evening prior to the search so that they could review it themselves. (*Id.*).

Fernandes testified that he knew before the warrant was executed, based upon information obtained during the investigation, including witness interviews, that Suite A had multiple offices, and he understood that multiple companies were being operated out of the suite, all of which were controlled by Kirik. (Tr. 49-50). Prior to executing the search warrant, however, Fernandes had not been inside the premises, was not familiar with its layout, and did not know for certain how many offices were inside the suite. (Tr. 33, 48-49). Fernandes did not indicate in his supporting affidavit that there were several individual offices inside the suite. (Tr. 32-33, 48).

During the warrant's execution, Fernandes observed the interior of the premises and testified as to his recollection of the layout. (Tr. 60-61). According to Fernandes, there were

11

two external doors leading into Suite A – a main door at the front and another door at the back right of the suite. (*Id.*). The suite also had a truck bay where trucks could load and unload materials. (*Id.*). According to Fernandes, Suite A did not connect directly to any other suite in the building. (*Id.*).

Suite A included a main area with desks, several offices, a break room, bathrooms, a hallway, a conference room, and a storage area. (*Id.*). The main area was in the front, directly behind the main door, and it had adjoining offices on either side, as well as others throughout the suite. (*Id.*). According to Fernandes, the first office to the right of the main area was associated with Main Logistics, but it was difficult to determine which of the other offices inside the suite were associated with which particular entities. (Tr. 34, 47). Fernandes estimated that there were approximately fourteen offices inside Suite A. (Tr. 33).

Fernandes testified that the search lasted approximately twelve hours and that the search team seized a variety of business records from the offices inside the suite. (Tr. 38). These records included banking records, employment records, and corporate records. (Tr. 30, 32). Fernandes was unable to estimate the total number of documents seized, but he testified that the materials seized filled approximately three-quarters of a tractor-trailer. (Tr. 56, 66). No documents were seized from any other suites in the building. (Tr. 66).

Fernandes testified that not every document inside Suite A was seized. (Tr. 21-22). According to Fernandes, if authorization to seize a particular document appeared "questionable, [they] [did]n't take it," although "for the most part, it was pretty cut and clear." (Tr. 22). For instance, according to Fernandes, documents associated with other companies owned or controlled by Kirik or his relatives were not seized.[3] (Tr. 51-52).

---

[3] To the extent Kirik suggests that Fernandes offered conflicting testimony as to whether all of the documents found within Suite A were seized (Docket # 61 at 13-14), I disagree. Fernandes testified that during the

Fernandes testified that he did not have knowledge of every single document that was seized and was not able to testify as to whether records concerning particular individuals, including tax, banking, employment, or personnel records, were seized.  (Tr. 31-32, 36-38, 41-42).  According to Fernandes, records relating to individuals may have been seized pursuant to the warrant's authorization to seize employee-related documents, including payroll records, employee information identifiers, tax records, and driver logs.  (Tr. 36).  Fernandes also did not know whether any briefcases or backpacks were seized, although he acknowledged that additional search warrants authorizing the search of any briefcases or backpacks were not sought. (Tr. 39-40).

Fernandes testified that no electronic devices were seized.  (Tr. 23-24, 52). Instead, members of the Computer Crimes Unit ("CCU") made an electronic copy of ("imaged") all of the data contained on each electronic device located inside the premises.  (Tr. 23-24). Fernandes testified that none of the devices were searched prior to imaging.  (Tr. 52-54). Fernandes did not directly participate in the imaging of the devices and was unable to recall where within the suite each of the electronic devices was located.  (Tr. 46).

According to Fernandes, after the search warrant was executed, members of the CCU uploaded the imaged data onto a computer program called "NUIX."  (Tr. 24, 62). Fernandes was responsible for reviewing the data to determine whether any of it fell within the information authorized to be seized by Attachment B of the search warrant.  (Tr. 24, 54-55, 62). To do this, Fernandes used search terms to identify responsive material and to narrow down which particular computers were likely to have responsive materials.  (Tr. 62-63).  He kept a log

_____

search records relating to other business operated by Kirik were located but not seized.  (Tr. 51-52).  In response to the question whether the officers "basically confiscated all the documents at Suite A," Fernandes responded, "yes." (Tr. 64-65).  On redirect, Fernandes clarified that all of the seized documents had been seized from Suite A, but that not every single document located within Suite A had been seized.  (Tr. 65-66).

of the searches he performed on the electronically stored data, and that log was provided to Kirik during discovery.  (Tr. 63).

## REPORT & RECOMMENDATION

Kirik seeks suppression of all tangible evidence seized from 105 McLaughlin Road, Suite A, during the execution of the search warrant on September 26, 2018.  (Docket ## 36 at 36-41; 61).  Kirik challenges the validity of the search warrant on the grounds that it was overbroad, unsupported by probable cause, and lacked particularity.  (*Id.*).  Kirik also maintains that suppression is warranted because the agents executing the warrant impermissibly conducted a general exploratory search that far exceeded the scope of the warrant.  (Docket # 61 at 17-22).

## I.   Validity of the Warrant

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.  The Warrants Clause of the Fourth Amendment "requires particularity and forbids overbreadth."  *United States v. Levy*, 2013 WL 664712, *5 (S.D.N.Y. 2013) (quoting *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009)), *aff'd*, 803 F.3d 120 (2d Cir. 2015).  Although the concepts of overbreadth and particularity often raise overlapping concerns, they are distinct legal issues.  *Id.*  "Particularity concerns arise when a warrant's description of the place to be searched or the items to be seized 'is so vague that [it] fails reasonably to alert executing officers to the limits' of their search and seizure authority."  *Id.* (quoting *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)).  By contrast, "breadth deals with the requirement that

14

the scope of the warrant be limited to the probable cause on which the warrant is based." *Id.* (internal quotation omitted).

### A. <u>Particularity</u>

As noted above, the Fourth Amendment requires that warrants particularly describe the place to be searched and the persons or things to be seized.  U.S. Const. Amend. IV. "Law enforcement agents are thus barred from executing warrants that purport to authorize 'a general, exploratory rummaging in a person's belongings.'"  *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 452 (S.D.N.Y. 2013) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  The requirement of particularity is satisfied where the warrant (1) identifies "the specific offense for which the police have established probable cause"; (2) describes the place to be searched; and, (3) specifies "the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (internal quotation omitted). Particularity ensures that "the permitted invasion of a suspect's privacy and property [is] no more than absolutely necessary."  *Id.* at 446 (quoting *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)).

According to Kirik, the warrant failed to adequately particularize the items to be confiscated and "left it virtually entirely to the discretion of the law enforcement officials conducting the search[] to decide what items were to be seized."[4]  (Docket ## 36 at 41; 61 at 18, 20-21).  Kirik contends that the sheer volume of information seized from the location demonstrates that the warrant was insufficiently particular.  (Docket # 61 at 20-21).  He also maintains that the warrant failed to sufficiently particularize the location to be searched because

---

[4] To the extent that Kirik's submissions may be interpreted to challenge the warrant on the grounds that the description of things to be seized was contained only in the application for the warrant and not the warrant itself (Docket # 61 at 21), I agree with the government (Docket # 62 at 3) that Attachment B to the warrant identified the items permitted to be seized.

it did not disclose that the business premises to be searched encompassed at least fourteen individual office spaces.  (*Id.* at 18).

Kirik's particularity challenges are unavailing.  With respect to Kirik's challenge to the articulation of items to be seized, "[a] warrant only needs to be specific enough to permit the executing officer to exercise reasonable, rational, and informed discretion and judgment in selecting what should be seized." *United States v. Triumph Cap. Grp., Inc.*, 211 F.R.D. 31, 57 (D. Conn. 2002).  "A warrant is sufficiently particular if it 'enable[s] the executing officer to ascertain and identify with *reasonable certainty* those items that the magistrate has authorized him to seize.'" *In re Application of Madison*, 687 F. Supp. 2d 103, 112 (E.D.N.Y. 2009) (alteration in original) (quoting *United States v. George*, 975 F.2d at 75).  The Second Circuit has held that warrants describing a category of seizable papers and including "an illustrative list of seizable items" are sufficiently particular for Fourth Amendment purposes, even if the executing agents "must exercise some minimal judgment as to whether a particular document falls within the described category." *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990); *see United States v. Longo*, 70 F. Supp. 2d 225, 250 (W.D.N.Y. 1999) ("the particularity requirement is not so exacting as to eliminate all discretion of the executing officers").  In other words, "[c]onstitutional particularity requires only that a warrant be 'sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items [] be seized.'" *United States v. Lake*, 233 F. Supp. 2d 465, 471 (E.D.N.Y. 2002) (alteration in original) (quoting *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir.), *cert. denied,* 479 U.S. 883 (1986)).

Thus, warrants have been upheld as sufficiently particular where they set forth "generic classifications of the items to be seized together with an illustrative listing which enables the executing officer to ascertain and identify with reasonable certainty" the items to be

16

seized.  *United States v. Triumph Cap. Grp., Inc.*, 211 F.R.D. at 57.  "The degree to which a warrant must state its terms with particularity varies inversely with [the] complexity of the criminal activity investigated."  *United States v. Cohan*, 628 F. Supp. 2d 355, 362 (E.D.N.Y. 2009) (internal quotations omitted).  Accordingly, the "complexity of the crimes under investigation is a factor the court may consider in making" its particularity determination.  *Triumph Cap. Grp., Inc.*, 211 F.R.D. at 57.

In this case, the warrant identified the crimes under investigation and articulated categories of documents relating to those crimes that were permitted to be seized, including incorporation records, shareholder certificates, tax records, financial accounting records, vehicle registrations, vehicle maintenance records, driver reimbursement and expense records, driver logs, trip data, toll records, credit card records, employee identifiers, payroll records, insurance policies, and driver qualification and licensing records.  (Docket # 63 at 27-29, Attachment B).  It also identified documents referring or relating to the USDOT or the FMCSA, documents reflecting residency information, such as utility bills or leases, records reflecting wire transfers, and documents demonstrating ownership or control of the premises.  (*Id.*).

I easily conclude that the items to be seized were identified with sufficient particularity, especially in view of the complexity and variety of crimes under investigation and the nature of the evidence that was sought.  It did not authorize seizure of all documents in the premises; rather, it identified categories of documents to be seized and provided illustrative lists to guide the executing officers in their determination of which documents to seize.  Although the warrant at issue authorized the seizure of a substantial amount of material, it provided appropriate guidance to the executing officers and did not provide them with unfettered discretion.  *See United States v. Cohan*, 628 F. Supp. 2d at 361 ("the number of different

categories of documents is immaterial so long as each type of document is clearly delineated, as is the case here").  Accordingly, I find that the warrant sufficiently particularized the items to be seized.  *See United States v. Discala*, 2023 WL 4118637, *3 (2d Cir. 2023) (summary order) ("the warrant specifically identified the offenses for which probable cause had been established, described the place to be searched, and included an illustrative list of items to be seized in relation to the designated crimes[;] [t]his illustrative list – which was subject to a temporal limitation and which specifically identified the companies at the core of the government's investigation, other individuals suspected of being involved in the scheme, and several specific categories of relevant documents – provided meaningful guidance for the officers executing the search as to render the warrant sufficiently 'particularized'"); *United States v. Mendlowitz*, 2019 WL 1017533, *9-10 (S.D.N.Y. 2019) ("the [w]arrant directed and limited executing agents to seize specific categories of evidence of the particular bankcard-processing scheme at issue[;] . . . [c]ourts routinely validate such warrants in the face of particularity challenges, reasoning that an illustrative list, coupled with a reference to the crimes for which evidence is sought, supplies sufficiently limiting guidance").

I also reject Kirik's challenge to the sufficiency of the description of the premises to be searched.  "A warrant's description of the premises to be searched is sufficiently particular 'if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended.'"  *United States v. Rocha-Gomez*, 412 F. Supp. 3d 369, 376 (S.D.N.Y. 2019) (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)).  "Where a structure contains a number of business entities, all controlled by a single individual or entity, a warrant authorizing a search of the single structure will be sustained."  *United States v. Main St. Distribs., Inc.*, 741 F. Supp. 353, 357 (E.D.N.Y. 1990).

The warrant at issue described the premises to be searched as an entire business suite, Suite A, located in a commercial building. (Docket # 63 at 25-26, Attachment A). It identified the entrances, windows, and bay areas of the particular suite. (*Id.*). Fernandes testified that although he had reason to believe that the suite contained individual offices, he had not been inside the premises and was not familiar with its specific layout when he applied for the warrant. (Tr. 32-33, 48-49). Importantly, his affidavit affirmed his belief that Kirik was operating many related motor carrier businesses out of Suite A. (Docket # 63 at ¶¶ 28, 39). He further testified that the executing officers, after entering the suite, were unable to determine – with the exception of one office which was believed to be used by Main Street Logistics – which businesses operated from or were associated with each individual office, if indeed such associations existed. (Tr. 34, 47). On this record, I find that the description of the premises was sufficiently particularized in the warrant. *See Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1024 (2d Cir. 1980) (search warrant for suite of offices that did not differentiate between target business and law offices was not insufficiently particular because there was no demarcation within the office suite between the two); *United States v. Sugar*, 606 F. Supp. 1134, 1151 (S.D.N.Y. 1985) (warrant authorizing search of "medical offices" contained within the premises sufficiently particular; "[the affiant agent] cannot reasonably have been expected to know about these rooms that are admittedly inaccessible to the public"); *see also United States v. Ofshe*, 817 F.2d 1508, 1514 (11th Cir.) (warrant for search of business premises sufficiently particular; "the agents learned only after the warrant was issued that the premises described in the warrant were subdivided into separate offices"), *cert. denied*, 484 U.S. 963 (1987); *In re Search of Tobaccoville USA, Inc.*, 2009 WL 982394, *2 (D.S.C. 2009) (warrant for search of business premises sufficiently particular where it did not particularize businesses operating out of separate

19

offices within the building; "[t]he building itself had no signs on the outside or inside designating separate offices or distinguishing [the three businesses]").

    B.    <u>Probable Cause and Overbreadth</u>

        "Law enforcement agents are . . . barred from executing warrants that purport to authorize a general, exploratory rummaging in a person's belonging." *United States v. Willis*, 2014 WL 6791386, *16 (W.D.N.Y. 2014) (quotations omitted), *report and recommendation adopted by*, 2015 WL 1915123 (W.D.N.Y. 2015).  While the Fourth Amendment's particularity requirement prevents wide-ranging searches by forbidding unduly vague descriptions of the items to be seized, the probable cause requirement limits the scope of the warrant to specific items for which probable cause may be shown.  *See Cohan*, 628 F. Supp. 2d at 359. Accordingly, "[a] warrant is overbroad if its description of the objects to be seized is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Yu*, 2023 WL 4687970, *10 (E.D.N.Y. 2023) (internal quotation omitted).

        Whether a search warrant satisfies the Fourth Amendment's probable cause requirement is judged under the now-familiar "totality of the circumstances" test.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*  A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for ... conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. at 238-39) (internal quotation

omitted).  Moreover, "resolution of doubtful or marginal cases in this area should be largely

determined by the preference to be accorded to warrants."  *Id.*

      Kirik challenges the search warrant for 105 McLaughlin Road both on the

grounds that it is unsupported by probable cause and is overbroad.

      1.    ***Probable Cause***

      Kirik maintains that probable cause was lacking because Fernandes's affidavit

does not supply any information as to the reliability of the two employee witnesses whose

information was relied upon in support of the application for the warrant.  (Docket # 61 at

16-17).  According to Kirik, the information was provided by two "disgruntled" former

employees of one of the businesses identified in the warrant.  (Docket # 36 at 39).  Kirik also

argues that the warrant failed to establish probable cause to believe that Kirik himself was

involved in criminal wrongdoing because "there were many employees/employers that had

access to the property searched and the 6.6 million records confiscated."  (*Id.* at 41).  Finally,

Kirik contends that the witnesses' information was stale, resulting in the impermissible seizure of

information that was twelve years old.  (Docket # 61 at 20).

      "In determining what constitutes probable cause to support a search warrant when

the warrant is based upon information obtained through the use of a confidential informant,

courts assess the information by examining the 'totality of the circumstances' bearing upon its

reliability."  *United States v. Smith*, 9 F.3d at 1012.  In evaluating the totality of the

circumstances, the court may consider whether the information an informant provides is

corroborated by independent police investigation.  *United States v. Canfield*, 212 F.3d 713,

719-20 (2d Cir. 2000).  Information provided by a known, reliable confidential informant may be

sufficient to establish probable cause, especially where law enforcement officials have

corroborated the information. *See United States v. Sykes*, 304 F. App'x 10, 12 (2d Cir. 2008)

(finding probable cause for search warrant based on reliable informant's observations

corroborated by police), *cert. denied*, 556 U.S. 1197 (2009); *United States v. Gagnon*, 373 F.3d

230, 236 (2d Cir. 2004).

        Information from an informant whose identity is known to law enforcement is

generally entitled to more credence than information from an anonymous tipster because the

former may be held accountable for the information provided. *See United States v. Salazar*, 945

F.2d 47, 50-51 (2d Cir. 1991), *cert. denied*, 504 U.S. 923 (1992). Moreover, there is "no need to

show past reliability when the informant … is in fact a participant in the very crime at issue."

*United States v. Gagnon*, 373 F.3d at 236 (quotation omitted). *See also United States v. Rowell*,

903 F.2d 899, 903 (2d Cir. 1990) ("the reliability of one of the informants is indicated by his

statement, made against his penal interest, that he had personally purchased cocaine from

[defendant]"); *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987) ("a participant in the

criminal activity at issue need *not* be shown to have been previously reliable before the

authorities may rely on his statements") (quotation omitted).

        As described above, in support of the application for the search warrant for 105

McLaughlin Road, Suite A, the government submitted the 44-paragraph affidavit of Fernandes,

which described in significant detail the investigation leading up to the application for the search

warrant. That affidavit summarized interviews with J.Z. and CW. Both witnesses directly

implicated the businesses identified in the indictment in a scheme designed to shield from the

FMCSA the relationship between the companies. They also implicated themselves in certain of

the unlawful activities under investigation.

Fernandes's affidavit clearly established the basis of the witnesses' knowledge – both were or had been employed by the motor carrier businesses under investigation and they were directly involved in the alleged criminal activities.  Each provided specific information about certain of Kirik's activities, particularly the efforts to deceive the FMCSA during its compliance review of Dallas Logistics.  In addition, the witnesses' identities were known to the law enforcement agents who interviewed them.  Significantly, the information provided by each was corroborated by the other.  For instance, both witnesses provided information that J.Z. had agreed to be listed as the owner of Dallas Logistics for the purpose of concealing from the FMCSA the true ownership of the company and its affiliation with Orange Transportation Services.  Both confirmed that the letter sent by CW to the FMCSA had contained false information about the company's intentions to operate out of Texas and the reasons why it never did.  Moreover, contrary to Kirik's contentions, both witnesses directly implicated him in the alleged criminal activity.  On this record, I find that the information contained in Fernandes's affidavit, viewed in totality, established probable cause justifying the issuance of the search warrant.

With respect to staleness, the information recounted in the 2018 warrant application that was supplied by the witnesses related to events occurring over the course of many years, from at least 2012 through 2016.  (Docket # 63 at ¶¶ 20, 29).  Of course, "[t]he age of the information is relevant only in so far as it affects the likelihood that the evidence will be found at the premises." *United States v. Zoernack*, 2005 WL 1837962, *2 (S.D.N.Y. 2005).  In this case, both witnesses informed investigators that Kirik controlled and operated all of his entities from the office located at 105 McLaughlin Road, Suite A, and that records of those business operations were stored at that premises either in paper form or electronically on the

computer.  (Docket # 63 at ¶¶ 39-40).  Significantly, J.Z. was interviewed in December 2017 (*id.* at ¶ 24), and CW was interviewed the same month as the warrant was issued and executed, September 2018, at which time she was apparently still employed by Kirik (*id.* at ¶¶ 19, 27, 35, 40) – establishing ample reason to believe that records would be found in Suite A in late September 2018.  On this record, I find that there was sufficient probable cause to conclude that the identified records and documents would be found in the premises.  *See United States v. Gerace*, 2022 WL 17478270, *6 (W.D.N.Y.) ("[c]omputer and computer equipment are not the type of evidence that rapidly dissipates or degrades") (internal quotation omitted), *report and recommendation adopted sub nom by*, *United States v. Bongiovanni*, 2022 WL 17139489 (W.D.N.Y. 2022); *United States v. St. Clair*, 2021 WL 3076677, *5 (S.D.N.Y. 2021) ("the nature of the conduct and the type of documents sought including written agreements, business records and communications regarding securities transactions weigh against a finding of staleness[;] . . . the [m]agistrate [j]udge did not err in finding that probable cause existed at the time of the search notwithstanding that the underlying securities fraud was alleged to have ended [five years earlier]"); *United States v. Zoernack*, 2005 WL 1837962 at *2 ("[i]n this case, the nature of the criminal enterprise (money transfers over a period of years), together with the kind of evidence to be seized (records pertaining to fraudulent activity) and the nature of the [p]remises (home used as primary residence and principal place of business), support the conclusions that the items sought were of the type that would be kept over a period of years and that there was a fair probability that they could be found in the [p]remises").

**2.     *Overbreadth***

Kirik challenges the scope of the warrant on the grounds that probable cause did not exist to search for records created or dated as far back as 2006 – twelve years prior to the

issuance of the warrant and six years prior to the earliest overt act identified in the indictment. (Docket ## 36 at 37-39; 61 at 20).  He also maintains that there was insufficient probable cause to seize records relating to any businesses other than Dallas Logistics, Inc., and Orange Transportation Inc. – the two businesses identified in the indictment.  (Docket # 36 at 38-39). These challenges are also unavailing.

As an initial matter, "case law is hardly uniform as to when, if at all, the absence of a time frame would violate the overbreadth prong of the Fourth Amendment."  *See United States v. Yu*, 2023 WL 4687970 at *11; *Triumph Cap. Grp., Inc.*, 211 F.R.D. at 58 ("[a] temporal limitation in a warrant is not an absolute necessity, but is only one indicia of particularity[;] . . . [t]hus, the absence of a temporal limitation does not render the warrant a prohibited general warrant").  In any event, the warrant in this case limited seizure of information to documents postdating 2005.  Although the more specific allegations in the indictment relate to purported criminal activities involving two companies beginning in 2012, Fernandes explained in his affidavit that the investigation also encompassed activities of other suspected affiliated companies beginning in 2006.  (Docket # 63 at ¶ 31).  Specifically, as stated above, CW and J.Z. told investigators that Kirik had owned or controlled various motor carrier businesses at different periods over time, all of which operated out of the 105 McLaughlin Road, Suite A, premises, and Fernandes represented that the investigation had revealed that since at least 2006 several other companies affiliated with Kirik had failed to disclose their affiliation on Forms OP-1.  (*Id.* at ¶¶ 28, 31, 39, 40).  These allegations are sufficient to defeat Kirik's overbreadth challenges.

C.      ***Leon***

In any event, I agree with the government (Docket # 38 at 11-12) that application of the *Leon* doctrine provides an alternative basis upon which to uphold the execution of the

warrant.  Nothing in the record suggests that the searching officers did not rely upon the search

warrant in good faith.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held

that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a

police officer whose reliance on a search warrant issued by a neutral magistrate was based on

"objective good faith," even though the warrant itself might ultimately be found to be defective.

*Id.* at 918-23; *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S.

1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000).  The

rationale underlying this good-faith exception is that the exclusionary rule "cannot be expected,

and should not be applied, to deter objectively reasonable law enforcement activity."  *United*

*States v. Leon*, 468 U.S. at 919.  The warrant here was not so facially deficient or so lacking in

probable cause that reliance upon it would have been objectively unreasonable.  *See id.* at 923;

*United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted).


## II.     <u>Execution of the Warrant</u>

I turn next to Kirik's challenge to the officers' execution of the warrant.  Kirik

maintains that the executing officers seized essentially all of the documents inside the premises

in disregard of the warrant's limitations, thus entitling him to blanket suppression of all evidence

seized.  (Docket # 61).  In support, Kirik points to the substantial number of officers engaged in

execution of the warrant and the sheer volume of evidence seized, which he describes as

approximately 6.6 million records.  (*Id.* at 21).  Kirik maintains that the officers improperly

searched each of the 14 offices inside the premises, unjustifiably seized records relating to 360

individuals who were not identified in the allegations in the warrant application, improperly

searched personal containers such as backpacks and briefcases without obtaining additional

warrants, and unjustifiably imaged 26 electronic media devices for subsequent review.  (*Id.* at 20-22).

"A search must be confined to the terms and limitations of the warrant authorizing it."  *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988).  In ordinary cases, when evidence outside the scope of a warrant is seized, suppression of those items only is the appropriate remedy.  *Id.*  Thus, blanket suppression, a remedy that the Second Circuit has characterized as "drastic" and reserved for "the most extraordinary of cases," is justified only when agents "flagrantly disregard" the terms of a warrant (1) by effecting a "widespread seizure of items that were not within the scope of the warrant" and (2) by not acting in "good faith."  *United States v. Liu*, 239 F.3d 138, 140, 142 (2d Cir. 2000) (internal quotations omitted), *cert. denied*, 534 U.S. 816 (2001).  As the Second Circuit has explained, "[t]he rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search."  *Id.* at 141.  Executing agents act in good faith "when they perform searches in objectively reasonable reliance on binding appellate precedent."  *United States v. Ganias*, 755 F.3d 125, 136 (2d Cir. 2014), *vacated on reh'g en banc on other grounds*, 824 F.3d 199 (2d Cir. 2016).  Moreover, suppression is appropriate "only where the benefits of deterring the [g]overnment's unlawful actions appreciably outweigh the costs of suppressing the evidence."  *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 141 (2009)).

Kirik suggests that the agents exceeded the scope of the warrant by searching all 14 offices inside Suite A.  (Docket # 61 at 22).  To the contrary, the warrant authorized a search of the entire business premises of Suite A.  In addition, according to Fernandes, even after entering the premises, officers were unable to associate particular offices with particular business

entities, other than one that appeared to be associated with Main Street Logistics, and testified

that documents authorized to be seized were found in the various offices in the suite.  (Tr. 47,

55).  On this record, I find the officers properly searched all offices located within Suite A.  *See*

*Nat'l City Trading Corp. v. United States*, 635 F.2d at 1024 ("the space utilized by the law office

on the one hand and the business operation on the other was for all intents and purposes

commingled[;] [a]s such, the entire suite, really being one set of offices, was properly subject to

search"); *In re Search of Tobaccoville USA, Inc.*, 2009 WL 982394 at *3 (upholding search

where agents were informed during the search that separate entities operated out of individual

offices; the offices of the other businesses "were not noticeably separated from the premises of

[the businesses identified in the warrant] by any signs or outward appearance in any way to

distinguish them[;] . . . [w]ith no such visible distinctions, the agents had an objectively

reasonable basis on which to conclude that these offices were all part of the area and premises to

be searched and the warrant authorized a search of the entire building"); *United States v. Main*

*St. Distribs., Inc.*, 741 F. Supp. at 358 ("[w]e find that the entire premises . . . was under the

complete control of the defendant[;] . . . [i]t follows that defendants' claim of improper conduct

on the part of law enforcement officers in that they 'showed a flagrant disregard of defendants'

rights' is rejected").

       With respect to the seizure of records relating to approximately 360 individuals,

nothing in the record before the Court suggests that the seized documents were outside the scope

of the warrant's authorization.  As Fernandes testified, and as review of Attachment B

demonstrates, the warrant authorized the seizure of numerous business records over an extensive

period of time, including records relating to the thirteen listed businesses' employees and drivers,

including driver logs, employee information and identifiers, payroll records, and driver

28

qualification and licensing records, as well as incorporation and shareholder records and communications with insurance carriers.  (Tr. 35-37; G. Ex. 1).  According to the government, records identifying the employees, for example, were relevant to the investigation in order to establish that the same employees worked for Kirik irrespective of the different names of the motor companies owned or controlled by Kirik.  (Docket # 62 at 3).  On this record, I find that the officers properly seized records relating to individuals not specifically named in the warrant.[5]

       Kirik's arguments that the officers improperly searched personal items located within the premises, such as backpacks, closed containers, and briefcases (Docket # 61 at 19), is unsupported by the record.  Fernandes testified that he could not recall whether any such items were inside the premises.  (Tr. 39-40).  In any event, as a general matter, "closed containers found during a lawful search do not require a separate warrant."  *United States v. Perez*, 574 F. Supp. 1429, 1435 (E.D.N.Y. 1983); *see United States v. Sensi*, 542 F. App'x 8, 10 (2d Cir. 2013) (summary order) ("the search warrant plainly authorized the officers to search the black duffle bag in [defendant's] closet, as it was a container in [defendant's] home that was capable of holding the items for which the search warrant authorized them to look"), *cert. denied*, 572 U.S. 1108 (2014); *United States v. Fugate*, 2022 WL 18359077, *5 (W.D.N.Y. 2022) ("[b]ecause the search undertaken here was authorized by the warrant, officers did not need separate permission to unlock the safe and search its contents"), *report and recommendation adopted by*, 2023 WL 279815 (W.D.N.Y. 2023); *United States v. Abrahams*, 493 F. Supp. 310, 312 (S.D.N.Y. 1980) ("[a] warrant to search a private home or office for specific objects might reasonably comprehend within its scope household items, containers, and personal accessories") (internal citation omitted).

---

[5]  The only individuals specifically identified in Fernandes's affidavit were Kirik, Y.K., Kirik's wife, CW, and J.Z.

Finally, I address Kirik's objection to the seizure of information from the electronic media devices found inside the premises.  (Docket # 61 at 19-20).  According to Kirik, the officers improperly imaged 26 electronic media devices and thereby "confiscate[d]" the information contained on those devices for later review.  (*Id.*).  Of course, this methodology was specifically authorized by the warrant itself pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.  *See* Fed. R. Crim. P. 41(e)(2)(B) ("[a] warrant . . . may authorize the . . . copying of electronically stored information[,] [and] . . . [u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant"); *United States v. Ray*, 541 F. Supp. 3d 355, 393 (S.D.N.Y. 2021) ("it is frequently the case with computers that the normal sequence of 'search' and then selective 'seizure' is turned on its head, as computer hardware is seized from a suspect's premises before its content is known and then searched at a later time") (quotations omitted).

Fernandes testified that the electronic data imaged from the electronic devices was loaded into a software program that permitted him to review the information to determine whether it fell within the scope of the warrant, which he did by using a search methodology, including particular search terms, designed to identify the records authorized to be seized.  He also testified that he made a record of the electronic searches he performed, which the government provided to the defense, and Kirik has not specifically challenged any of those searches as impermissible or outside the scope of the warrant.  On this record, Kirik has failed to establish that the imaging and subsequent review of the electronic data presents any basis for suppression.  *United States v. Mendlowitz*, 2019 WL 1017533 at *13 ("[f]ar from flagrantly disregarding the [s]earch [w]arrant, the [g]overnment instead abided by it[;] [t]he [g]overnment plainly had authority to seize the devices at issue, and then, consistent with the terms of the

[w]arrant, conduct an extraction and review from the devices to determine whether they contained responsive material").

    In my estimation, no grounds exist for imposing the "extreme remedy" of blanket suppression.  Fernandes's testimony establishes that approximately 30 agents participated in the execution of the search warrant for approximately twelve hours, resulting in the seizure of 205 containers of documents and the imaging of approximately 26 electronic media storage devices. Although the search was lengthy, extensive, and involved many law enforcement agents, neither the sheer number of law enforcement personnel involved nor the volume of information seized transforms an otherwise lawful search into an unlawful one, let alone a flagrantly illegal one. Fernandes's testimony reveals that the executing officers were provided a copy of the warrant the evening before the search and were briefed concerning the investigation and scope of the warrant prior to its execution.  Moreover, despite Kirik's suggestion that Fernandes conceded that "the search basically was to seize everything located in Suite A and determine at a later time if the . . . documents were relevant or appropriately and legally [seized,]" (Docket # 61 at 19), Fernandes's testimony demonstrated that the officers endeavored to seize only documents authorized by Attachment B and did not seize documents associated with other businesses that were not listed in the warrant.

    Even after an evidentiary hearing on the execution of the warrant, the record does not identify a single document or item of evidence seized in contravention of the terms of the warrant.  Nothing more than speculation supports Kirik's suggestion that any information or documents that were seized fell outside the scope of the authorizing warrant, let alone that the agents engaged in the "widespread seizure" of unauthorized documents.  *United States v. Schwimmer*, 692 F. Supp. 119, 127 (E.D.N.Y. 1988) ("[n]othing in the record . . . supports a

conclusion that these files were seized in flagrant disregard of the warrant's terms[;] [g]iven the unique problems presented by a search for documents . . . I am persuaded that the agents conducted a good faith search in a manner that intruded only minimally on [defendant's] privacy rights").

   For all of the reasons explained above, I recommend that Kirik's motion to suppress evidence seized from 105 McLaughlin Road, Suite A, be denied.

## **CONCLUSION**

   For the reasons stated above, I recommend that the district court deny Kirik's motion for an order suppressing tangible evidence.  (Docket ## 36, 61).

*s/Marian W. Payson*

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
   December 5, 2023

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(c) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(c)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      December 5, 2023

---

[6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).